UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

KENYA STROMAN,

     Plaintiff,

v.                              Case No. 2:08-CV-796-FtM-DNF

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

_____/

## OPINION AND ORDER[1]

The Plaintiff filed an application for a period of disability and disability insurance benefits on May 5, 2004, alleging disability as of February 1, 2005[2] [Tr. 93-95]. The claim was denied initially and upon reconsideration.[Tr. 26, 32-34]. On January 15, 2008, a hearing was held before Administrative Law Judge Ann Azdell. [Tr. 325]. On February 11, 2008, Administrative Law Judge Azdell issued her decision denying the Plaintiff's application. [Tr. 14-20] The Appeals Council denied the Plaintiff's Request for Review on September 16, 2008, [Tr. 4-6] making the ALJ's decision the final decision of the Commissioner. For the reasons set out herein, the decision is **REVERSED** and **REMANDED**.

---

[1] Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated February 20, 2009. (Doc.# 16).

[2] The Plaintiff applied for disability benefits on June 21, 2004, alleging that she had been disabled since November 12, 2002. At the hearing, however, the Plaintiff amended the date she said she became disabled to February 1, 2005, because she worked and earned over the amount considered substantial gainful activity prior to that date. [Tr. 14, 77-82]/

The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed legal memoranda.

## I. SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ DECISION AND STANDARD OF REVIEW.

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § § 404.1505-404.1511. The plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

On May 5, 2004, the Plaintiff filed her application for Disability Insurance Benefits alleging disability beginning February 1, 2005. The Decision of ALJ Azdell, dated February 22, 2008, denied the Plaintiff's claim for benefits. (Tr. 14-20). At Step 1, the ALJ found the Plaintiff has not engaged in substantial gainful activity since February 1, 2005, the amended alleged onset date (20 C.F.R./ 404.1520(b) and 404.1571) and that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2009. [Tr. 16]. At Step 2, the ALJ found that the Plaintiff has had the following severe combination of physical impairments, as per the Regulations: cervical and lumbar strain, lumbar facet syndrome, narcolepsy and mild sleep apnea. (20 C.F.R. 404.1520(c)). The ALJ found these physical impairments to cause significant limitation in the Plaintiff's ability to perform basic work activities. The ALJ found the Plaintiff's depression and anxiety, considered singly and in

combination, causes only minimal limitation in the Plaintiff's ability to perform basic mental work activities and are therefore non-severe. [Tr. 16]. At Step 3, the ALJ found that during the period in question, the Plaintiff did not have an impairment or combination of impairments which met the criteria of any of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). At Step 4, the ALJ determined Plaintiff was able to perform her past relevant work as a youth caretaker and this work did not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity. (20 C.F.R. 404.1565). The ALJ found the testimony of the impartial vocational expert to be credible and that the Plaintiff retained the residual functional capacity to perform her past relevant work. [Tr. 20]. Accordingly, the ALJ found the Plaintiff not disabled at step five of the sequential evaluation.

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Walden v. Schweiker*, 672 F.2d 835, 838-9 (11th Cir. 1982).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

*Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II.    REVIEW OF FACTS

The Plaintiff was born in on April 7, 1976, and was thirty-two (32) years old at the time of the Administrative Hearing. [Tr. 61]. The Plaintiff has a high school education and past relevant work as a therapy aid and a youth caretaker. [Tr. 328, 340]. The record shows that the Plaintiff has suffered from daytime sleepiness from the age of 12. The Plaintiff was treated by Dr. Glenn Adams at the Lung Associates of Sarasota, Associates in Sleep Medicine. [Tr. 234-236]. Dr. Adams notes reveal that the Plaintiff falls asleep while reading, watching TV, at the movies, while attending church and even when a passenger in a car. The Plaintiff stated that she had fallen to sleep while driving on three separate occasions but there had been no automobile accidents as a result. [Tr. 234]. At one point, the Plaintiff worked in a day care and would get sleepy while attending to the children. [Tr. 234].

The Plaintiff underwent two sleep studies. The first sleep study was normal with the exception of sleep onset REM for a period of 18.5 minutes. The second study reveals mild obstructive sleep apnea with 11 apneas and 29 hypopneas for an RDI of 5.8. [Tr. 234]. The Plaintiff was diagnosed by Dr. Adams with narcolepsy and mild obstructive sleep apnea. However, Dr. Adams noted that most of the disorder was narcolepsy and that the mild

obstructive sleep apnea was the main cause for her hypersomnolence. [Tr. 235]. Dr. Adams recommended that the Plaintiff's sleep apnea should be treated and he ordered an overnight sleep study for titration of a CPAP machine. [Tr. 235].

On September 9, 2002, Dr. Adams noted that the Plaintiff was using the CPAP +5 the entire night. [Tr. 232]. It appeared that the Plaintiff was less hypersomnolent during the daytime, but that the hypersomnolence still persisted. The Plaintiff was also taking Provigil 100 mg. and by March of 2003, the Plaintiff was up to 400 mg. of Provigil [Tr. 232]. On May 27, 2003, the Plaintiff advised Dr. Adams that she was having daytime sleepiness every other day. Dr. Adams notes indicated that he would support the Plaintiff's application for disability, stating :[c]learly she is unable to work if every other day she is profoundly hypersomnolent." [Tr. 229]. By September of 2003, the Plaintiff appeared to be doing well with residual spells of hypersomnolence and by May of 2004, it was noted that she was a little more fatigued than the last time. [Tr. 225].

On September 30, 2004, the Plaintiff advised Dr. Adams that she was working full time and unable to nap and that her sleepiness was as bad as ever. [Tr. 241]. When Dr. Adams spoke with the Plaintiff about her prior improvement, the Plaintiff indicated that the difference was she was not working 8 hours a day and when she wasn't working she felt much better. The Plaintiff was seen by Dr. Adams on February 2, 2005, and he noted that the Plaintiff was still fairly tired. At that time, Dr. Adams added Ritalin-SR to her medications. [Tr. 236]. On May 11, 2005, Dr. Adams noted that the Plaintiff was doing better on the combination of Provigil and Ritalin and increased her Ritalin. [Tr. 240].

On March 10, 2006, the Plaintiff was seen at Community Care Family Clinic for depression and mood swings by Susan Cobb, LCSW. [Tr. 267-268]. The Plaintiff felt depressed, had decreased concentration and attention and was feeling hopeless. The Plaintiff also stated that her energy level was low and she was experiencing anxiety. [The Plaintiff continued to be seen at the Clinic throughout 2006 and 2007.]

On January 24, 2007, Dr. Adams noted that the Plaintiff was doing well with Xyrem 3 mg. twice nightly, Ritalin SR 20 mg. B.i.d., Provigil 200 mg. B.i.d. and CPAP +7. [Tr. 244]. Dr. Adams noted that the Plaintiff was still falling asleep during the day, and fell asleep about half the time while watching TV or reading and had sleep paralysis once a week. [Tr. 244]. On July 25, 2007, Dr. Adams indicated that although the Plaintiff was doing well on her medications, "[S]he is still not able to work and cannot drive. She has periods of falling asleep during the day." [Tr. 283].

On May 10, 2007, the Plaintiff returned to the Community Care Family Clinic. The Plaintiff's mood was described as stable, but she complained of having panic attacks daily. [Tr. 251]. On May 30, 2007, Dr. Cobb's notes reflect he was providing the Plaintiff with interpersonal skills, support and encouragement. The Plaintiff's appearance was normal, her behavior was guarded and withdrawn. [Tr. 250].

On April 18, 2007, the Plaintiff was seen at De Soto Memorial Hospital Center for Family Health complaining of a "sharp right sided chest pain". The Plaintiff was also experiencing bilateral leg pain. [Tr. 311]. The Plaintiff was treated with Motrin 400 and Lortab for the pain. [Tr. 312]. Testing for venous clot or embolus were negative. On April 20, 2007,

the medical notes are "leg pain ? Fibromyalgia." [Tr. 269]. On June 28, 2007, the Plaintiff returned to the Family Center and was seen by Howard Pinsky, ARNP. The Plaintiff again reported extreme lower leg pain that would "come and go". The Plaintiff was placed on Neurontin. The Plaintiff returned on July 12, 2007, stating that although the medication had helped, the pains were worse when she stood and in the morning. The Plaintiff also reported back pain during those times. The Plaintiff was then referred for x-rays and an MRI. [Tr. 275]. On July 19, 2007, the Plaintiff was advised to seek pain management but was having a problem finding someone who would accept Medicaid.

On August 24, 2007, the Plaintiff was seen by Dr. A. Cuneyt Ozaktay, for pain management. Dr. Ozaktay reviewed the MRI studies which revealed L2-3, L3-4 and L4-5 facet joints bilaterally were arthritic. Dr. Ozaktay noted that the Plaintiff's presentation was complicated by her anxiety and depression along with narcolepsy and sleep apnea. Dr. Ozaktay indicated that the Plaintiff should not use narcotic based medications due to her narcolepsy and her young age. Dr. Ozaktay discussed the options of lumbar medial branch blocks and physical therapy. [Tr. 292-293]. Plaintiff underwent lumbar facet blocks and relief from that procedure lasted about two weeks.

On September 18, 2007, the Plaintiff again went to Mr. Pinsky for follow-up of her chronic lower back pain and tender spots on her head. The Plaintiff was diagnosed with chronic lower back pain and cervical lymphadenopathy. [Tr. 280]. On September 19, 2007, Mr. Pinsky wrote a letter to Plaintiff's counsel indicating that the Plaintiff was not "able to be reliable due to her problematic medical condition which does not allow her to perform in a regular way".

"This prognosis is, however, not good long term and she needs a great deal of assistance at every level of her existence - daily and for future of self and children." On November 13, 2007, the Plaintiff underwent neurolytic/radio frequency fact lumbar blocks. [Tr. 290].

## III. SPECIFIC ISSUES AND CONCLUSIONS OF LAW:

### A. THERE IS NOT SUBSTANTIAL EVIDENCE TO SUPPORT THE ALJ'S FINDING REGARDING THE PLAINTIFF'S CREDIBILITY

The Plaintiff contends that the ALJ failed to find her statements concerning the level of daytime sleepiness that she was experiencing not credible. [Tr. 18]. The ALJ stated,

> "The objective medical evidence does not confirm the severity of the alleged pain and other subjective symptoms, nor does the weight of the medical and non-medical evidence demonstrate the presence of an impairment that reasonably could be expected to produce pain, other subjective symptoms and functional limitations to the degree alleged by the claimant." [Tr. 18].

The Plaintiff was treated from 2002 until the hearing in 2008 by Dr. Glen Adams, Board Certified in Sleep Medicine. [Tr. 244]. The Plaintiff was repeatedly diagnosed with Narcolepsy.[3] [Tr. 225-226, 229,232, 235, 244]. "Narcoleptic sleep episodes can occur at any time, and thus frequently prove profoundly disabling". "At various times throughout the day, people with narcolepsy experience fleeting urges to sleep. If the urge becomes overwhelming, patients fall asleep for periods lasting from a few seconds to several minutes." (Fact Sheet attached to Plaintiff's memorandum as Exhibit 1).

---

[3] Narcolepsy is a chronic neurological disorder caused by the brain's inability to regulate sleep-wake cycles normally. The National Institute of Neurological Disorders and Stroke Narcolepsy Fact Sheet.

The ALJ incorrectly concluded that the weight of the medical and non-medical evidence did not demonstrate the presence of an impairment that reasonably could be expected to produce the Plaintiff's subjective symptoms. Dr. Adams performed the Multiple Sleep Latency Test (MSLT) on the Plaintiff during the day to measure her tendency to fall asleep and to determin whether the isolated elements of REM sleep intrude at inappropriate times during waking hours. Objective evidence confirms the severity of the Plaintiff's complaints of daytime sleepiness. The record shows that at various times the medications and treatments did lessen the daytime sleepiness, however, they never completely controlled it. As stated previously, Dr. Adams indicated that the Plaintiff was doing well on her medications but "She is still not able to work and cannot drive. She has periods of falling asleep during the day." [Tr. 283]. Thus, even though medications and treatment improved the Plaintiff's symptoms to some degree, they remained severe enough to prevent her from working. The ALJ's determination is not supported by substantial evidence in this case.

### B. THE ALJ ERRED IN NOT RE-CONTACTING THE PLAINTIFF'S TREATING PHYSICIAN

The Plaintiff argues that the ALJ did not expressly reject Dr. Adams opinion about the Plaintiff's work abilities. [Tr. 19-20]. The ALJ claims that Dr. Adams gave several opinions about the Plaintiff's ability to work which the ALJ claimed were inconsistent with each other. The ALJ should not be free to speculate as to what the treating physician may have meant. The Plaintiff further argues that the ALJ should have re-contacted Dr. Adams to completely determine the basis for the doctor's opinion. The Commissioner's rulings would require that the ALJ re-contact the treating source if the ALJ cannot ascertain the basis of the opinion.

SSR 96-p states:

> Because treating source evidence (including opinion evidence)
> is important, if the evidence does not support a treating source's
> opinion on any issue reserved to the Commissioner and the
> adjudicator cannot ascertain the basis of the opinion from the
> record, the adjudicator must make "every reasonable effort" to
> re-contact the source for clarification of the reasons for the
> opinion.

The Ruling is clear that the ALJ must make every reasonable effort to re-contact the treating physician (Dr. Adams) to clarify his evidence. Dr. Adams' opinions were not inconsistent. Initially, Dr. Adam indicated that he supported her disability because she would be unable to work if every other day she was profoundly hypersomnolent. [Tr. 229]. On May 7, 2004, Dr. Adams indicated that Plaintiff's disability was "total and permanent." [Tr. 225]. On July 29, 2004, the Plaintiff was working in a facility that required 12 hour shifts for three days a week. The Plaintiff was unable to maintain that schedule, so Dr. Adams wrote a letter indicating that the Plaintiff could only work 8 hour shifts. [Tr. 224, 243]. On September 30, 2004, Dr. Adams found that although the Plaintiff was trying to work she was struggling. [Tr. 241]. Dr. Adams supported her attempt to work part time. In the end, he indicated that she could not work due to the frequency of her somnolence and sleep paralysis. Again, if the ALJ felt that the statements made by Dr. Adams were inconsistent, then the ruling required her to contact Dr. Adams and give him the opportunity to explain those inconsistencies prior to rejecting Dr. Adams opinion altogether.

## C.   THE ALJ DID NOT RESOLVE THE CONFLICT BETWEEN THE VE'S TESTIMONY AND THE "DOT" IN THIS CASE.

The ALJ found the Plaintiff was limited to a restricted range of medium work. The restrictions consisted of the Plaintiff only occasionally being able to climb stairs, balance, stoop crouch, kneel or climb. The ALJ found the Plaintiff would not be able to climb ladders, ropes or scaffolds and that she should avoid exposure to dangerous moving machinery and unprotected heights. [Tr. 17].

The VE testified that the Plaintiff could return to her past work as a youth caretaker. [Tr. 340]. However, according to the Dictionary of Occupational Titles ("DOT") a youth worker is required to stoop and crouch on a frequent basis. ['DOT' at 359.677-010]. Thus, the VE's testimony is inconsistent with that of the "DOT". The ALJ's decision states that pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the Dictionary of Occupational Titles. [Tr. 20].

SSR 00-4p requires that when there is an apparent unresolved conflict between the VE and the DOT, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p. The ruling also requires that at the hearing level, the ALJ "will inquire, on the record, as to whether or not there is such consistency." In the present case, the ALJ made no such inquiry. [Tr. 339-342]. *Estrada v. Barnhart*, 417 F.Supp.2d 1299, 1302 (M.D. Fla. 2006).

Further, when the ALJ asked the VE at the hearing whether a person with "sleep problems and specifically narcolepsy could not be guaranteed to be able to maintain attention and concentration throughout a two-hour period during the course of a workday would that preclude the performance of any of these jobs?" The VE responded, "Yes, ma'am." [Tr. 341]

## IV. CONCLUSION

For the foregoing reasons, the ALJ's decision is inconsistent with the requirements of law and unsupported by substantial evidence. Accordingly, the decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C.§405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE and ORDERED** in Chambers at Ft. Myers, Florida, this _11th_ day of _February_ 2010.

Douglas N. Frazier
United State Magistrate Judge

Copies furnished to:
All Counsel of Record